UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/17/09
```

-----------------------------------------x
STEVEN RASCO AND GARRICK MEIKLE,          :
                                          :
               Plaintiffs,                :
                                          : 05 Civ. 7147(BSJ)
       v.                                 :
                                          : **OPINION AND ORDER**
                                          :
BT RADIANZ, RADIANZ AMERICAS INC., AND    :
ERIC HORESNYI,                            :
                                          :
               Defendants.                :
-----------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Steven Rasco and Garrick Meikle (collectively, "Plaintiffs") brought this action alleging that Defendants BT Radianz, Radianz Americas, Inc. ("Radianz"), and Eric Horesnyi ("Mr. Horesnyi") discriminated and retaliated against them on the basis of national origin, color, and race, in violation of Title VII of the Civil Rights Act of 1974 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law § 296 et seq. ("SHRL"); and the Administrative Code of the City of New York §§ 8-107 and 8-102 et seq. ("CHRL").[1] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants have moved for summary judgment on all claims. For the reasons set forth below, Defendants' motion is DENIED with respect to Plaintiffs' hostile

---

[1] Against Mr. Horesnyi, Plaintiffs only assert their CHRL claims.

workplace claims and GRANTED with respect to the remainder
of Plaintiffs' claims.

## I. BACKGROUND[2]

Radianz is a company that provides telecommunications
services to the financial services industry.  Its Inside
Sales Group ("Inside Sales" or the "Group") consisted of
Account Executives ("AEs"), sales personnel who conducted
telemarketing activities in order to identify and sell to
smaller customers.  (Defendants' Statement of Undisputed
Material Facts ("Defs.' R. 56.1 Stmt.")  ¶¶ 1-11.)[3]

Radianz hired Mr. Rasco, Mr. Meikle, Erica Attonito
and John Tarantino as AEs in January 2003.  (Defs.' R. 56.1
Stmt. ¶ 12.)  Mr. Rasco is Asian-American.  Mr. Meikle is
African-American.  Ms. Attonito and Mr. Tarantino are both
Caucasian.  Before joining Radianz, Plaintiffs had worked
in telecommunications sales and in the financial services
industry; both held NASD licenses.  Neither Mr. Tarantino
nor Ms. Attonito held any NASD licenses, but both had prior
experience in telecommunications sales.  Shortly after
their hire, Plaintiffs achieved perfect scores on an
examination that tested AEs' knowledge of the financial
services industry.  (Plaintiffs' Statement of Undisputed

---

[2] Unless otherwise noted, these facts are undisputed.
[3] The Court only considers the parties' Statements of Undisputed
Material Facts for facts in support of which they cite admissible
evidence.

Material Facts ("Pls.' R. 56.1 Stmt.") ¶¶ 6-10[4]; Defs.' R.
56.1 Stmt. ¶¶ 59-64.)

Mr. Horesnyi managed Inside Sales from May 2003 until
May 1, 2006.  In that capacity, he was responsible for
distributing sales leads and accounts to AEs.  Before Mr.
Horesnyi's arrival in May 2003, there was no system for the
distribution of leads; lead allocation was essentially a
"free for all."  In 2004, Mr. Horesnyi instituted the "lead
ball system," under which AEs rotated an object or ball
around the Group by placing it on AEs' desks: after an AE
received a lead, he or she passed the ball to the next
person in the rotation.  During this process, in order to
avoid assignment conflicts, Mr. Horesnyi determined whether
a lead was an existing client, which had already been
assigned to a particular AE.  So as to ensure a timely
response to customers, the "lead ball" skipped an AE if he
or she was not at his or her desk.  (Defs.' R. 56.1 Stmt.
¶¶ 11, 91-107.)

Over the course of their employment at Radianz,
Plaintiffs were subjected to a litany of racial slurs and
insults.  (Pls.' R. 56.1 Stmt. ¶¶ 35-55.)  In late November

---

[4] The Court notes Plaintiffs' failure to comply with Local Rule 56.1.
Pls.' R. 56.1 Stmt proffers argument and conclusory assertions in the
place of facts, its numbered paragraphs bear no relation to Defs.' R.
56.1 Stmt., and it frequently cites pages of deposition testimony that
fail to support the facts for which they are cited.

3

or early December of 2003, Mr. Rasco orally complained to Mr. Horesnyi about Caucasian AEs' racially-derogatory remarks; Mr. Meikle did the same in January 2004.[5] (Pls.' R. 56.1 Stmt. ¶¶ 62-63.) From January to October of 2004, Plaintiffs' desks were moved two aisles away from the Inside Sales seating area. (Defs.' R. 56.1 Stmt. ¶ 72.) Mr. Horesnyi testified that a shortage of desk space necessitated this move. (Id. ¶ 72.) Inside Sales was part of an open floor plan; from their relocated desks, Plaintiffs could speak to the rest of the Group by raising their voices. (Id. ¶ 76.) Further, some AEs relied on Instant Messenger ("IM"), a form of electronic mail, to communicate with each other; Mr. Meikle often used IM to communicate with other AEs even before his relocation. (Id.) During their temporary relocation, Plaintiffs continued to participate in the lead ball rotation. (Id. ¶ 98.)

AE sales performance was measured, in large part, by revenue generated. By this criterion, in 2003, Mr. Meikle ranked first of five AEs, and Mr. Rasco ranked third; Mr. Tarantino and Ms. Attonito ranked second and fourth, respectively. With regard to percentage of sales target

---

[5] As discussed below, Defendants deny that Plaintiffs made any complaint before September 1, 2004, but for the purposes of this motion, the Court credits Plaintiffs' testimony on this issue. See Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003).

achieved, in 2003, Mr. Meikle ranked first, Mr. Tarantino
second, Ms. Attonito third, and Mr. Rasco fourth.  Mr.
Meikle and Mr. Tarantino were named "Rookies of the Year"
for 2003.  For the aggregate period from May 2003 to May
2004, Ms. Attonito ranked first in terms of revenue
generated, followed by, in order, Mr. Tarantino, Mr. Rasco,
and Mr. Meikle.  (Defendants' Response to Plaintiffs'
Statement of Undisputed Material Facts (Defs.' Resp.") ¶
179; Rankings of Inside Sales Personnel as of May 2004, Ex.
U to Affidavit of Mitchell Boyarsky in Support of
Defendants' Motion for Summary Judgment ("Boyarsky Aff.,
Ex. U")).

In early 2004, Radianz created two "Team Leader"
positions within the Group.  Team Leaders were to function
as mentors and role models for new AEs, and the position's
requirements included the ability to "[m]entor new hires to
ensure fast ramp-up and [i]dentify recurring issues and
propose solutions," "[e]nergy, drive and enthusiasm," a
"[t]eam mindset," and "[e]xcellent motivation and ability
to work hard."  In May 2004, William Betz, Head of U.S.
Sales, and John Madigan, Head of Sales U.S. Regions and
Telesales, selected Ms. Attonito to fill the first Team
Leader position.  Mr. Horesnyi promoted Tarantino to the

5

same position soon thereafter. (Defs.' R. 56.1 Stmt. ¶¶ 13-17.)

Mr. Meikle testified that, when he asked Mr. Horesnyi why Ms. Attonito and Mr. Tarantino were promoted, Mr. Horesnyi said they were "team players" and cited their commitment to the Inside Sales Group. (Defs.' R. 56.1 Stmt. ¶¶ 56, 71.) According to Mr. Horesnyi, Mr. Rasco was not promoted to Team Leader in May 2003 because of tardiness issues and inferior performance, among other factors. (Pls.' R. 56.1 Stmt. ¶ 173.) Mr. Rasco claims that he was not made aware that his tardiness was an issue until December 2004. Mr. Horesnyi testified, however, that he spoke to Mr. Rasco about his repeated tardiness in 2003, and that Mr. Rasco promised to improve. (Defs.' R. 56.1 Stmt. ¶ 26.)

Additionally, AEs were expected to update company databases to keep track of accounts and leads, but Mr. Rasco consistently - and Mr. Meikle occasionally – failed to follow these protocols. (Defs.' R. 56.1 Stmt. ¶¶ 33-42, 115.) Further, during the first half of 2004, Mr. Horesnyi learned that two female Radianz employees had complained of Mr. Meikle's inappropriate behavior. (Id. ¶ 43.) Ms. Attonito also complained of Mr. Meikle's offensive conduct on two separate occasions. (Id. ¶ 143.) Two other female

6

employees lodged similar complaints against Mr. Meikle in December 2005.  (Id. ¶ 144.)

On September 1, 2004, Plaintiffs' counsel sent Radianz's designated Equal Employment Opportunity officers a letter complaining of Plaintiffs' subjection to racially-derogatory remarks and Mr. Horesnyi's discriminatory distribution of sales opportunities.  (Pls.' R. 56.1 Stmt. ¶ 143; Defs.' R. 56.1 Stmt. ¶ 132.)  In the course of his investigation of Plaintiffs' complaint, Hal Bretan, Radianz's Head of Legal, interviewed nine individuals who worked in, or sat in close proximity to, Inside Sales, or were identified by Plaintiffs' counsel as having witnessed derogatory remarks.  Mr. Bretan found no evidence of discrimination.  (Defs.' R. 56.1 Stmt. ¶¶ 133-135.)

In 2004, Mr. Rasco ranked first out of seven AEs, as measured by total revenue and percentage of sales target achieved; Mr. Meikle ranked second in total revenue and fourth in sales target achieved.  (Defs.' R. 56.1 Stmt. ¶¶ 73-75; Inside Sales Rankings as of the End of 2004, Boyarsky Aff., Ex. V.)  Mr. Rasco was promoted to Team Leader in January 2005, at which point Mr. Horesnyi asked Mr. Rasco to give up a portion of his accounts for reassignment to the rest of the Group.  (Pls.' R. 56.1 Stmt. ¶ 171; Defs.' R. 56.1 Stmt. ¶¶ 154-156.)  Upon their

promotions to Team Leader, Ms. Attonito and Mr. Tarantino similarly relinquished a portion of their accounts for redistribution. (Defs.' R. 56.1 Stmt. ¶¶ 154-156.) As set forth in a December 14, 2004, email from Mr. Horesnyi to Mr. Bretan, after Mr. Bretan suggested the addition of timeliness and dedication to the positional requirements, a revised Team Leader job description was applied to Mr. Rasco. (Pls.' R. 56.1 Stmt. ¶¶ 171-172; Defs.' Resp. ¶ 178.)

In or about May 2005, Mr. Tarantino and another Radianz employee threw a green sponge ball, with a face drawn on it, at Mr. Rasco, and Mr. Tarantino called Mr. Rasco a "stupid chink." Plaintiffs characterize the drawing as a caricature of an Asian male. Shortly thereafter, on May 3, 2005, Plaintiffs' counsel sent another discrimination complaint to Mr. Bretan, alleging that the ball derogatorily depicted Mr. Rasco or another Asian male. In response, Mr. Bretan conducted another investigation. (Pls.' R. 56.1 Stmt. ¶¶ 174-176; Defs.' R. 56.1 Stmt. ¶¶ 136-138.) Once again, Mr. Bretan did not find evidence of discrimination, and no disciplinary action was taken. (Pls.' R. 56.1 Stmt. ¶ 176; Defs.' R. 56.1 Stmt. ¶ 138.) Mr. Rasco does not know who drew the image on the ball, nor was he ever told that the ball depicted

8

him.  (Defs.' R. 56.1 Stmt. ¶ 141.)  Defendants submit that Michael Markes, a former Radianz employee, drew the image, which was supposed to depict another former Radianz employee, Kyle Jones.  Kyle Jones is Caucasian.  (Defs.' R. 56.1 Stmt. ¶ 139-149.)

In a June 2005 meeting, Mr. Horesnyi, Steve Messinger, and Robert Garzilli placed Mr. Rasco on a Performance Improvement Plan ("PIP"), which addressed problems relating to Mr. Rasco's performance, attendance, and tardiness. (Defs.' R. 56.1 Stmt. ¶¶ 157-159.)  That PIP stated that, during the first half of 2005, Mr. Rasco ranked seventh out of seven AEs in sales; failed to attend any business-related events during a sales conference; continued to arrive at work at 9:30 AM or later, rather than at 9 AM; was discourteous, insulting, and insubordinate to Mr. Horesnyi in front of other members of the Group; and continued to fail to update the company database to reflect the status of his accounts.  (Defs.' R. 56.1 Stmt. ¶ 159.) Plaintiffs allege that Mr. Messinger told Mr. Rasco not to inform his attorney of the meeting or the PIP, and that Mr. Rasco was told that he was being demoted and relieved of all his duties as Team Teader.  (Pls.' R. 56.1 Stmt. ¶ 177.)  The PIP provided Mr. Rasco the option of giving up "the coaching responsibilities associated with your Team

Leader role (without any diminution of your base salary).
However should you elect to continue in that role, you will
be expected to serve as a highly visible role model . . . "
(Boyarsky Aff., Ex. Y ("Rasco PIP I"), at 4.)  Defendants
dispute Mr. Rasco's claim that he was demoted.  Mr. Rasco
received another PIP on August 2, 2005, relating to
attendance problems.  (Pls.' R. 56.1 Stmt. ¶ 177; Defs.' R.
56.1 Stmt. ¶ 161.)

On August 8, 2005, Mr. Rasco resigned from Radianz.
(Pls.' R. 56.1 Stmt. ¶ 183; Defs.' R. 56.1 Stmt. ¶ 146.)
Mr. Rasco had intended to continue working until August 19,
2005, but instead, he was escorted from the building after
tendering his resignation.  (Pls.' R. 56.1 Stmt. ¶ 183.)
Upon the termination of his employment, in an alleged
departure from standard Radianz procedure, Mr. Rasco did
not receive an exit interview or a letter advising him of
his obligations under Radianz's confidentiality agreement.
(Pls.' R. 56.1 Stmt. ¶¶ 178, 182.)

On August 12, 2005, Plaintiffs filed the instant
action.  On the same date, Radianz filed a lawsuit against
Mr. Rasco in New York Supreme Court, New York County,
alleging that Mr. Rasco breached Radianz's confidentiality

agreement.[6] (Pls.' R. 56.1 Stmt. ¶ 178.)   Radianz believed
that Mr. Rasco was going to work for a competitor and had
emailed trade secret information regarding Radianz's entire
North American customer database to his home account.   Mr.
Rasco entered into a written agreement to resolve the suit.
(Defs.' Resp. ¶ 178.)

Radianz placed Mr. Meikle on a PIP in September 2005.
(Defs.' R. 56.1 Stmt. ¶ 75.)   In November of that year, in
the course of an IM exchange, Mr. Horesnyi responded to Mr.
Meikle's greeting of "[y]o" by writing, "hey boy."   (Pls.'
R. 56.1 Stmt. ¶ 34.)   In 2006, Mr. Meikle declined a
promotion to Business Development Executive ("BDE") because
he thought it was a "lateral move."   (Defs.' R. 56.1 Stmt.
¶¶ 49-52.)   As of June 26, 2006, Mr. Meikle remained
employed by Radianz and had "no plans to leave."   (Defs.'
R. 56.1 Stmt. ¶ 147.)

## II. LEGAL STANDARD

To succeed on a motion for summary judgment, a party
must show that the absence of material and genuine factual
issues dictates judgment as a matter of law.   See Celotex

---

[6]Defendants urge the Court to disregard Plaintiffs' arguments relating
to this lawsuit, because, like many of their allegations, it was not
mentioned in their pleadings.   It is "well-settled that parties may not
raise claims for the first time in opposition to summary judgment,"
Gamble v. Chertoff, No. 04 Civ. 9410 (WHP), 2006 U.S. Dist. LEXIS
93645, at *10 (S.D.N.Y. Dec. 27, 2006), but the Court addresses the
lawsuit nonetheless.

11

Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this context, the Court "is not to resolve issues of fact but only to determine whether there is a genuine triable issue as to a material fact." Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000). The Court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

That non-moving party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that [its] version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (citations and quotations omitted). Evidentiary submissions relating to a summary judgment motion must adduce facts that would be admissible in evidence. Fed. R. Civ. P. 56(e).

In an employment discrimination case, a defendant is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). Because "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason

12

expressly forbidden by law," courts should proceed with caution before granting summary judgment to defendants in discrimination cases. Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999). Moreover, in determining the appropriateness of summary judgment, the Court will consider the record as a whole and not "in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence." Howley, 217 F.3d at 151.

Nevertheless, it "is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). Summary judgment is appropriate in such a case where the plaintiff relies "on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." Tojzan v. New York Presbyterian Hosp., No. 00 Civ. 6105 (WHP), 2003 U.S. Dist. LEXIS 5138, at *9-10 (S.D.N.Y. Mar. 31, 2003).

The Court's analysis of Plaintiffs' Title VII claims applies to Plaintiffs' claims under the SHRL and CHRL as well, because "New York courts examine claims under those statutes with the same analytical lens as corresponding

Title VII-based claims." Patane v. Clark, 508 F.3d 106,
113 (2d Cir. 2007).[7]

## III. DISCUSSION

Plaintiffs' claims fit into five categories: failure
to promote, other disparate treatment, hostile workplace,
retaliation, and constructive discharge.

### A. Discrimination

In evaluating Plaintiffs' claims of discrimination for
the purposes of summary judgment, the Court applies the
burden-shifting analysis set forth in McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802-03 (1973), and its
progeny. Under that framework, Plaintiffs must satisfy the
minimal burden of making out a prima facie case of
discrimination; the burden then shifts to Defendants to
produce a legitimate, nondiscriminatory reason for their
actions; and the final burden rests on Plaintiffs to prove,
by a preponderance of the evidence, not only that the
proffered nondiscriminatory reason was pretextual but also
that Defendants discriminated against Plaintiffs. See
Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133,

---

[7] Some New York state courts have held that the CHRL holds employers to
a higher standard than Title VII and the SHRL, and should be liberally
and independently construed. But the Second Circuit has yet to
recognize such a distinction, and the Court is unaware of any New York
appellate court to do so either. See Ferraro v. Kellwood Co., 440 F.3d
96, 99, 100-03 (2d Cir. 2006); Ortiz-Moss v. N.Y. City DOT, No. 05
Civ. 4206 (THK), 2008 U.S. Dist. LEXIS 32048, 55-56 (S.D.N.Y. Apr. 18,
2008).

14

143 (2000). To establish pretext, Plaintiffs must show "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis supplied).

### 1. Failure to Promote

Plaintiffs claim that Defendants' promotion of Ms. Attonito and Mr. Tarantino in Plaintiffs' stead constituted discrimination on the basis of national origin, color and race, in violation of Title VII, the SHRL and the CHRL. Even if Plaintiffs can make a prima facie case on this claim, they cannot rebut Defendants' non-discriminatory justification. This claim fails.

### a. Plaintiffs' Prima Facie Case

To meet their initial burden, Plaintiffs need only establish that (1) they were members of a protected class; (2) they were qualified for the promotions; (3) their failure to be promoted was an adverse employment action; and (4) the positions were ultimately filled with individuals who were not members of the protected class. Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). Defendants contest only Plaintiffs' qualification for promotion.

The burden of establishing a prima facie case "is not onerous." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 255-56 (1981). For the purposes of this motion, the Court assumes that Plaintiffs have met that burden.

### b. Defendants' Response

Defendants have articulated legitimate, non-discriminatory justifications for their failure to promote Plaintiffs in May 2004. Defendants' burden on this issue "is one of production, not persuasion." Reeves, 530 U.S. at 142 (2000). "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. The defendant need not persuade the court that it was actually motivated by the proffered reasons." Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (citation omitted).

Defendants cite a variety of reasons for which Ms. Attonito and Mr. Tarantino were selected for promotion, highlighting their superior performance as AEs as well as their demonstrated leadership and commitment to the Inside Sales Group. Mr. Betz and Mr. Madigan chose Ms. Attonito for the first Team Leader position because they viewed her as the best overall performer in the Group. (Defs.' R. 56.1 Stmt. ¶ 15.) In choosing Mr. Tarantino to fill the second Team Leader position, Mr. Horesnyi testified that, after comparing Plaintiffs' sales numbers to Mr. Tarantino's, he "figured that both [Plaintiffs] were way

16

behind John Tarantino in terms of sales achievement."
(Defendants' Memorandum of Law in Support of Summary
Judgment ("Defs.' Mem.") at 10-11.)

Plaintiffs do not dispute that, for the aggregate
period from May 2003 to May 2004 – the one-year period
preceding the promotion, and Mr. Horesnyi's first year
managing the Group - Ms. Attonito and Mr. Tarantino ranked
first and second, respectively, in revenue generated, while
Mr. Rasco and Mr. Meikle ranked third and fourth,
respectively. Significantly, Mr. Horesnyi testified that,
for the purposes of comparing AEs' respective performance
and evaluating the candidates for promotion, this one-year
period was the most relevant period of time. (Defs.' R.
56.1 Stmt. ¶ 16.) He also testified that superior sales
performance was the primary criterion for promotion. (Id.;
Defs.' Mem. at 12.)

Additional factors supported Ms. Attonito's and Mr.
Tarantino's candidacies, including their mentorship of
junior AEs. On the other hand, Plaintiffs' behavioral
issues "put them a little farther back," Mr. Horesnyi
testified. (Defs.' Mem. at 12.) Unlike Ms. Attonito and
Mr. Tarantino, Mr. Rasco "was often late to work" and was
told to improve; "He said he would and he did not," Mr.

17

Horesnyi said.[8]  Id.  The record reflects that Mr. Rasco's
chronic tardiness and frequent absences were serious issues
throughout his employment at Radianz, and these issues
impeded his candidacy for the May 2004 promotion.  In
addition, Mr. Rasco failed to perform essential AE
functions - despite Mr. Horesnyi's repeated requests, Mr.
Rasco often failed to update his account software and
refused to contact assigned leads.  (Defs.' R. 56.1 Stmt.
¶¶ 33-42.)

Mr. Meikle similarly failed, on occasion, to update
his account software.  (Defs.' R. 56.1 Stmt. ¶ 15.)
Defendants also highlight two complaints that female
Radianz employees had lodged, prior to May 2004, against
Mr. Meikle for inappropriate behavior.[9]  These complaints
hindered Mr. Meikle's promotion to a position in which he
would serve as a leader and model for other AEs.  (Defs.'
R. 56.1 Stmt. ¶¶ 43-47.)

By pointing to Plaintiffs' inferior sales performance
for the one-year period preceding the May 2004 promotions,
as well as their behavioral problems, Defendants establish
non-discriminatory justifications for their promotion of

---

[8] Plaintiffs assert that Mr. Rasco was not made aware of this issue
until December 2004, but they do not dispute the fact of Mr. Rasco's
chronic tardiness.  (Pls.' Mem. at 21.)
[9] Over the course of Mr. Meikle's first three years at Radianz, five
female co-workers filed six complaints against him.  (Defs.' R. 56.1
Stmt. ¶¶ 43-45, 143-144.)

18

Ms. Attonito and Mr. Tarantino in Plaintiffs' stead. These justifications rebut Plaintiffs' prima facie presumption of discrimination; because Defendants have met their burden of production, that presumption "simply drops out of the picture." St. Mary's, 509 U.S. at 511.

### c. Plaintiffs' Evidence of Pretext

To avoid summary judgment, Plaintiffs must produce evidence that Defendants' proffered justifications mask prohibited discrimination. See id.; Burdine, 450 U.S. at 255-56. In order to do so, however, Plaintiffs must show "both that the reason was false, and that discrimination was the real reason." St. Mary's, 509 U.S. at 515 (emphasis supplied). Plaintiffs cannot meet this burden.

Plaintiffs contend that the "clear superiority of Plaintiffs' experience and training over those promoted in May 2004" reveals discrimination. (Plaintiffs' Memorandum of Law in Opposition to Summary Judgment ("Pls.' Mem.") at 37.) The Second Circuit instructs, "to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, would have chosen the candidate selected over plaintiff for the job in

19

question.'" Byrnie v. Town of Cromwell Bd. of Educ., 243
F.3d 93, 103 (2d Cir. 2001) (citation omitted). Plaintiffs
fall short of this standard.

Indeed, the uncontested evidence of Plaintiffs'
behavioral issues – chiefly, Mr. Rasco's chronic tardiness
and frequent absences, and the complaints that female
Radianz employees repeatedly lodged against Mr. Meikle's
behavior - alone provides grounds upon which a reasonable
person would pass Plaintiffs over for promotion. The
parties also agree that sales performance weighed heavily
in the promotional decision. And Plaintiffs do not dispute
that, for the one-year period upon which Mr. Horesnyi
relied in evaluating candidates for promotion, Plaintiffs
did not perform as well as Ms. Attonito and Mr. Tarantino.

In the face of this evidence, Plaintiffs launch a host
of misguided contentions. To underscore the purported
superiority of their qualifications, Plaintiffs present a
declaration by Rebecca Gustamante, a former Radianz Senior
Human Resource Generalist. Ms. Gustamante, who interviewed
and recommended prospective AEs, including Plaintiffs, Ms.
Attonito and Mr. Tarantino, declared that, "[o]f all the
candidates who applied for the AE position," Plaintiffs
were the "most qualified based upon their experience in the

financial services industry and their sales experience."[10]
(Pls.' R. 56.1 Stmt. ¶ 2.)

That declaration is silent, however, as to Plaintiffs'
performance at Radianz or their qualifications *for
promotion to Team Leader*. Plaintiffs have not demonstrated
the relevance of prior experience, training, and knowledge
of the financial industry to the selection of Team Leaders.
It follows that Plaintiffs' pre-Radianz qualifications, as
impressive as they may have been, neither establish their
entitlement to promotion in May 2004 nor call into question
the legitimacy of Defendants' promotional decisions or the
justifications therefor.

Finally, Plaintiffs accuse Radianz and
Mr. Horesnyi of racial enmity, which, Plaintiffs argue,
exposes Defendants' discriminatory intent. In or around
November 2003 and May 2004, respectively, two Radianz
executives, Brennan Carley and Howard Edelstein, referred
to prior, unrelated complaints of workplace discrimination
as "extortion" and "blackmail." And in November 2005, Mr.
Horesnyi responded to Mr. Meikle's IM greeting of "[y]o" by
writing, "hey boy." Plaintiffs insist that these events,
combined with Radianz's responses to those prior, unrelated

[10] Defendants dispute the accuracy of Ms. Gustamante's declaration,
noting that Mr. Tarantino and Ms. Attonito had more account executive
and telecommunications experience than Plaintiffs. (Defs.' Resp. ¶ 2.)

complaints and Mr. Horesnyi's alleged failure to act upon
Plaintiffs' complaints of racial hostility, reflect a
corporate culture that tolerates, condones and effectively
encourages discrimination.  In this way, Plaintiffs attempt
to color Defendants' seemingly-benign explanations with
discriminatory intent.  (Pls.' Mem. at 39.)

Isolated remarks, however, cannot constitute proof of
an employer's racial animus unless they causally connect to
Plaintiffs' claims.  Townsend v. Clairol Inc., 26 F. App'x
75, 78 (2d Cir. 2002).  Even if the aforementioned comments
could be construed to indicate racial enmity,[11] Plaintiffs
cannot link them to the May 2004 promotional decision.
Plaintiffs do not allege that Mr. Carley or Mr. Edelstein
had anything to do with that decision, and Mr. Horesnyi's
exchange with Mr. Meikle did not occur until November 2005.
See Hayles v. Advanced Travel Mgmt. Corp., No. 01 Civ.
10017 (BSJ), 2003 U.S. Dist. LEXIS 23407 at *53 (S.D.N.Y.
Jan. 5, 2004) ("[W]here a plaintiff alleges that her
employers made racial remarks, she must show that these
remarks were temporally linked to the adverse employment
action allegedly suffered.").  Moreover, standing alone,

---

[11]Defendants assert that the "extortion" and "blackmail" remarks were
logical responses to complainants' tactical use of media attention, and
that Mr. Horesnyi's "hey boy," in response to Meikle's greeting of
"[y]o," was a benign colloquialism.  (Defendants' Reply Memorandum of
Law in Support of their Motion for Summary Judgment ("Defs.' Reply") at
16.)

Plaintiffs' allegations that Mr. Horesnyi ignored their complaints do not foster an inference that the failure to promote Plaintiffs manifested an embedded institutional racial animus; indeed, Mr. Rasco's promotion several months later weighs against the existence of any such animus.

The Court's function is not "to second-guess [an employer's] business decisions," but rather to determine whether the employer's proffered explanation for its actions is simply "a reason manufactured to avoid liability." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988); see also Byrnie, 243 F.3d at 103 (2d Cir. 2001) ("The court must respect the employer's unfettered discretion to choose among qualified candidates.") (citation omitted). Plaintiffs' attempts to second-guess their employer's business decision do not suffice to raise triable issues of material facts. Accordingly, the Court grants summary judgment on Plaintiffs' claim of failure to promote.

## 2. Other Disparate Treatment

Plaintiffs allege that Mr. Horesnyi distributed sales opportunities in a discriminatory manner, claiming that, because of their race, color and national origin, they were assigned fewer, and less-valuable, sales leads and accounts than their Caucasian peers. (Amended Complaint ("Am.

23

Compl.") ¶¶ 43-46.) In addition, Plaintiffs contend that,
in order to damage Mr. Rasco's relationships with clients,
Defendants discriminatorily instructed Mr. Rasco not to
solicit clients to terminate contracts for disconnected
services, and to provide inaccurate dates for client
connections to the New York Stock Exchange and American
Stock Exchange. (Am. Compl. ¶¶ 43-46.) Both parties'
submissions frame these allegations as a separate
discrimination claim. Whether viewed separately or as part
of Plaintiffs' failure to promote claim, these allegations
lack evidentiary support and fail as a matter of law.

To make a prima facie claim of discrimination,
Plaintiffs must show circumstances giving rise to an
inference of discrimination. D'Cunha v. Genovese/Eckerd
Corp., 479 F.3d 193, 195 (2d Cir. 2007). Plaintiffs have
not produced a modicum of evidence, apart from their own
self-serving assertions and beliefs, that they received
fewer, or less-valuable sales opportunities, let alone that
sales opportunities were assigned discriminatorily.[12]  And
Plaintiffs have not contested the documentary evidence - in
the form of numerous emails provided by Defendants -

---

[12] In his deposition, Mr. Meikle referred, several times, to an
"independent audit" that supported Plaintiffs' claims. Despite
Defendants' repeated discovery requests, however, Plaintiffs never
produced any such document, eventually responding that they "do not
possess additional documents responsive to this request." (Defs.' R.
56.1 Stmt. ¶¶ 117-119.)

24

indicating that they received leads and accounts in the
same way as other AEs throughout their tenure at Radianz.

Plaintiffs' claims that Mr. Rasco received disparate
and discriminatory instructions relating to his dealings
with clients are similarly unsupported.  Defendants and
Plaintiffs' co-workers deny the issuance or existence of
any instructions or company policy on these matters, and
Plaintiffs' assertions to the contrary are nothing more
than "isolated evidence [that] is insufficient to make a
showing that [Defendants] maintained a policy or custom."
Graham v. Long Island R.R., 230 F.3d 34, 41 (2d Cir. 2000).

To the extent that Plaintiffs' allegations of other
disparate treatment can be construed as part of their
failure to promote claim, they do not alter the Court's
analysis of that claim.  In view of the evidence,
Plaintiffs' assertions of other disparate treatment neither
expose discriminatory intent nor cast doubt upon the
validity of Defendants' proffered explanations for their
failure to promote Plaintiffs.  "Bald assertions or
conjecture unsupported by evidence are insufficient to
overcome a motion for summary judgment."  Ramos v. Marriott
International, Inc., 134 F.Supp.2d 328 (S.D.N.Y. 2001).
Because the record is bereft of evidence that reasonably

25

supports a finding of prohibited discrimination, the Court
grants summary judgment on this claim.

## B. Hostile Workplace

Plaintiffs allege that Defendants subjected them to a
hostile workplace. (Am. Compl. ¶¶ 47-55.) To prevail on a
hostile workplace claim, Plaintiffs must demonstrate (1)
hostility that is "sufficiently severe or pervasive to
alter the conditions of [their] employment and create an
abusive working environment," Harris v. Forklift Sys.,
Inc., 510 U.S. 17, 21 (1993); and (2) a specific basis for
imputing that hostility to Defendants. See Distasio v.
Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998).

Defendants argue that the incidents alleged were
insufficiently severe or pervasive to amount to a hostile
environment, and deny liability for the non-supervisory
conduct that Plaintiffs allege. The Court disagrees with
both of these contentions and denies summary judgment on
this claim.

### 1. Hostility

"The question of whether a work environment is
sufficiently hostile to violate Title VII is one of fact."
Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001).
On a motion for summary judgment, the question for the
Court is whether a reasonable factfinder could conclude

26

that "the harassment is of such quality or quantity that a
reasonable employee would find the conditions of her
employment altered for the worse."   Whidbee v. Garzarelli
Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000).
The Court cannot, as a matter of law, say that no
reasonable factfinder could so conclude in this case.

        Additionally, Plaintiffs must set forth facts that
support a subjective perception of hostility.   Mormol v.
Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir.
2004)(citation omitted).   Because Title VII is not "a
general civility code," Oncale v. Sundowner Offshore
Services, Inc., 523 U.S. 75, 81 (1998), "simple teasing,
offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the
terms and conditions of employment."   Faragher v. City of
Boca Raton, 524 U.S. 775, 788 (1998) (citation and
quotations omitted).

        In evaluating the conduct at issue, the Court "look[s]
at all the circumstances.   These may include the frequency
of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance." Harris, 510 U.S. at 23.   In
view of Plaintiffs' shared workplace environment, because a

                                    27

hostile workplace claim "focuses on the nature of the workplace environment as a whole," evidence of conduct directed towards either of the individual Plaintiffs informs the Court's analysis of both of their claims.[13] Williams v. Consol. Edison Corp., 255 F. App'x 546, 549 (2d Cir. 2007).

### a. Mr. Meikle

Plaintiffs submit that Mr. Tarantino and another AE, John Danchak,[14] directed a stream of racial slurs at Mr. Meikle. Mr. Meikle testified that Mr. Danchak called him "nigger" "too many" times, estimating at least ten occurrences. (Transcript of the Deposition of Garrick Meikle ("Meikle Dep."), Boyarsky Aff., Ex. G, at 79.) Mr. Rasco heard Tarantino and Mr. Danchak refer to Mr. Meikle as "house nigger." (Pls.' R. 56.1 Stmt. ¶¶ 35.) According to Mr. Meikle's testimony, he overheard Mr. Danchak state, "I can't believe I'm being outperformed by a nigger;" on "numerous" occasions, Mr. Tarantino and Mr. Danchak referred to African-Americans generally, and Mr. Meikle specifically, as "moolies" or "eggplants;" and Mr. Meikle

---

[13]While Plaintiffs discuss allegations and complaints made by other Radianz employees in 2003, Plaintiffs do not allege that they were exposed to or affected by these complaints or the environments that produced them, and these allegations were absent from Plaintiffs' pleadings. As a result, the Court will not consider those allegations or Plaintiffs' discussion thereof. See, e.g., Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001).

[14] Radianz terminated Mr. Danchak's employment in or around August 2004.

received racially demeaning images over email, one of which depicted an African-American Radianz employee with a noose drawn around his neck.[15]  (Pls.' R. 56.1 Stmt. ¶¶ 35-38.) Further, Plaintiffs allege that Mr. Horesnyi's use of the term, "boy," to address Mr. Meikle during an IM exchange evinced racial hostility.  Plaintiffs also provide an undated transcript of an IM conversation in which Mr. Meikle told Mr. Danchak, "You look like a Biotch to me!" and Mr. Danchak responded, "easy N*gg*r."  (Affirmation of Brandon Chao ("Chao Aff."), Ex. 7; Pls.' Mem. at 8.)  Three of Plaintiffs' co-workers - Ms. Attonito, Mr. Tarantino, and Ms. Pirooz - corroborated Mr. Danchak's use of the word, "moolie," but those individuals denied ever using or hearing anyone at Radianz use the words "eggplant" or "nigger."  (Defs.' Mem. at 39-40.)

### b. Mr. Rasco

The evidence illustrates Mr. Rasco's subjection to a similar litany of insults and slurs.  "Every day," Mr. Danchak and Mr. Tarantino mocked stereotypical Asian speech patterns by greeting Mr. Rasco with, "her-ro," and called Mr. Rasco "Donald," in reference to Donald Lee, another Asian-American Radianz employee.  In response to Mr. Rasco's protests, Mr. Danchak laughed, "what's the

---

[15] Plaintiffs do not specify the date or source of this email.

29

difference?  You all look alike anyway."  (Pls.' R. 56.1
Stmt. ¶ 43; Transcript of the Deposition of Steven Rasco
("Rasco Dep."), Chao Aff., Ex. A, at 115, 117.)

In addition, Mr. Rasco testified that his peers made
fun of American Idol contestant William Hung; that, every
time they ate Chinese food - "at least once or twice a
month" - Mr. Danchak and Mr. Tarantino yelled at Mr. Rasco,
"in front of the entire sales organization," about his
"mother's cooking.  She's going to make Flied Lice;" that,
on three occasions in 2004, Mr. Tarantino and Mr. Danchak
told him, "You slanted-eyed bastard, you can't see;" and
that Ms. Attonito told him that he was "good looking for an
Asian guy."  (Pls.' R. 56.1 Stmt. ¶¶ 54-55; Rasco Dep. at
252-254.)  Mr. Meikle overheard Mr. Tarantino refer to
Asian-Americans generally, and Mr. Rasco specifically, as
"chink," and Ms. Attonito said it was possible that Mr.
Danchak did the same.  (Pls.' R. 56.1 Stmt. ¶¶ 44, 46.)
The testimony of Plaintiffs' co-workers confirms that Mr.
Danchak used the term, "flied lice," and called Mr. Rasco
"Donald."  (Pls.' R. 56.1 Stmt. ¶¶ 43-44, 46.)

On August 3, 2004, Mr. Danchak sent several AEs,
including Mr. Rasco, an email, titled "X-Mas at the
Rasco's," that ridiculed stereotyped Asian speech patterns.
(Pls.' R. 56.1 Stmt. ¶ 45;  Chao Aff., Ex. 10.)  In or

30

around May 2005, Mr. Tarantino and another Radianz employee
threw a green sponge ball with a face drawn on it at Mr.
Rasco, and Mr. Tarantino called Mr. Rasco a "stupid chink."
Plaintiffs characterize the drawing as a caricature of an
Asian male. (Pls.' R. 56.1 Stmt. ¶ 51.[16])

In view of the totality of the circumstances, both
Plaintiffs have adduced sufficient evidence to create a
dispute as to material facts that would support their
hostile work environment claim. Defendants argue that the
aforementioned harassment was not severe or pervasive
enough to render the workplace "hostile." But the remarks
and incidents to which Plaintiffs testify were frequent,
continuous, and occasionally severe. See, e.g., Williams,
255 F. App'x at 549 (underscoring the severity of the word
"nigger"). Defendants do not contest the racially-hostile
nature of terms like "nigger," "chink," "slanted-eyed
bastard," and "moolie;" the parties only dispute the fact
and frequency of their use. In sum, Plaintiffs have
produced evidence from which a jury could determine that
they were subjected to a "steady barrage of opprobrious

---

[16] Again, Mr. Rasco does not know who drew the image on the ball, nor
was he ever told that the ball depicted him. (Defs.' R. 56.1 Stmt. ¶
141.) Defendants submit that Michael Markes, a former Radianz
employee, drew the image, which was supposed to depict another former
Radianz employee, Kyle Jones. Kyle Jones is Caucasian. (Defs.' R.
56.1 Stmt. ¶ 139-149.)

31

racial comments." Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997) (quotations and citations omitted).

## c. Plaintiffs' Conduct

Defendants contend that Plaintiffs' own racially, ethnically and sexually-offensive conduct precludes the possibility that they found the environment in which that conduct occurred subjectively hostile. With regard to Mr. Meikle, five female Radianz employees complained, on six occasions, of Mr. Meikle's inappropriate workplace behavior.[17] (Defs.' R. 56.1 Stmt. ¶¶ 43-45, 143-144.) One of these complaints stemmed from Mr. Meikle's email transmission of a video titled "Never Scare a Brother," which Ms. Attonito found racially offensive. (Defs.' Resp. ¶ 45; Defs.' Mem. at 41.) Defendants also argue that Mr. Horesnyi's "hey boy" comment and Mr. Danchak's use of the word "n*gg*r" on IM comments could not have offended Mr. Meikle because he continued both conversations without protest. (Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Reply") at 27; Chao Aff., Ex. 7.) With regard to Mr. Rasco, Ms. Attonito and Mr. Tarantino both testified that Mr. Rasco made frequent and inappropriate remarks regarding Mr.

---

[17] Following two complaints in December 2005, Mr. Meikle was admonished for his conduct. (Defs.' R. 56.1 Stmt. ¶ 144.)

32

Tarantino's Italian heritage. (Transcript of the Deposition of Erica Attonito ("Attonito Dep."), Boyarsky Aff., Ex. C, at 203; Transcript of the Deposition of John Tarantino ("Tarantino Dep."), Boyarsky Aff., Ex. PP, at 142-143; Defs.' Mem. at 42.)

The Court agrees that such behavior on the part of Plaintiffs may weaken their claim that they found the workplace subjectively hostile. But Plaintiffs both testified to and complained of that subjective hostility, and their testimony raises questions of credibility that are not properly answered here.

## 2. Employer Liability

The evidence also gives rise to a genuine factual dispute about Defendants' liability for the hostile work environment. Where "non-supervisory co-workers" - like Mr. Danchak - foster workplace hostility, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004).

Plaintiffs present evidence that, in November or December of 2003, Mr. Rasco orally complained to Mr. Horesnyi about comments made by his Caucasian peers, and

that Mr. Meikle did the same in January 2004. (Pls.' R. 56.1 Stmt. ¶¶ 62-63.) Plaintiffs' testimony comprises the only evidence that these complaints (the "Initial Complaints") were made. Defendants deny that Plaintiffs made any complaint before September 2004, emphasizing Plaintiffs' failure to set forth any details relating to either of these alleged conversations, as well as the absence of any reference thereto in Plaintiffs' counsel's September 1, 2004 letter or their pleadings in this action. (Defs.' Resp. ¶¶ 39, 47; Defs.' Reply at 29.)

Notwithstanding the strength of Defendants' arguments, Plaintiffs' testimony amounts to evidence that they complained to Mr. Horesnyi prior to September 2004. The Court must view this evidence in the light most favorable to Plaintiffs, thin as that evidence may be. Savino v. City of N.Y., 331 F.3d 63, 71 (2d Cir. 2003). Defendants do not - and, in view of their denial that the Initial Complaints occurred, cannot - dispute their failure to take any remedial action in response to the Initial Complaints.

Where a jury might find that harassment continues after complaints are made, a trial court must deny summary judgment. See Whidbee, 223 F.3d at 72 ("[W]e have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's

34

response was adequate.")  And the record indicates that
Plaintiffs' harassment continued well after their Initial
Complaints.  Because a jury could find a hostile work
environment and impute it to Defendants, the Court denies
summary judgment on this claim.

## C.  Retaliation[18]

Plaintiffs allege that, in retaliation for their
complaints of discrimination, Defendants illegally (a)
segregated Plaintiffs from their peers; (b) created a
hostile work environment; (c) discriminatorily distributed
and confiscated sales opportunities and issued instructions
that obstructed Mr. Rasco's client relationships; (d)
withheld paychecks from Mr. Meikle; and (e) refused to
alleviate the impact Plaintiffs' repayments to Radianz for
lost commissions, or "clawbacks."  Plaintiffs further
allege that, after they complained of discrimination, (f)
individuals at Radianz retaliated against Plaintiffs by
boasting of their ties to the Mafia.  Finally, Plaintiffs
allege that Defendants retaliated against Mr. Rasco by (g)
placing him on PIPs, then demoting, (h) constructively
discharging, and (i) filing a lawsuit against him.  (Pls.'
Mem. at 53-59; Am. Compl. ¶¶ 56-81.)

---

[18] Plaintiffs do not clearly delineate their claims;  rather, they use
varying allegations in varying contexts.  Accordingly, several of these
allegations repeat and overlap with the claims previously discussed.

35

### 1. Standard

To establish a prima facie case of retaliation,
Plaintiffs must show: "[1] participation in a protected
activity known to the defendant; [2] an employment action
disadvantaging the plaintiff; and [3] a causal connection
between the protected activity and the adverse employment
action." Richardson v. Comm'n on Human Rights &
Opportunities, 532 F.3d 114, 123 (2d Cir. 2008) (citation
omitted). If a plaintiff meets that burden, the defendant
must articulate a legitimate non-retaliatory reason for the
employment action at issue; to avoid summary judgment, a
plaintiff must then show that the defendant's proffered
reason was a pretext for retaliation. See Slattery, 248 F.
3d at 94.

For a plaintiff's conduct to constitute participation
in a protected activity, it is enough that she has made
"informal protests of discrimination, including making
complaints to management." Gregory v. Daly, 243 F.3d 687,
700-01 (2d Cir. 2001) (citation omitted). As set forth
above, Plaintiffs made four separate complaints of
discrimination, in November or December 2003, January
2004,[19] September 1, 2004, and May 3, 2005. Plaintiffs

---

[19] Again, the Court notes Defendants' denial that Plaintiffs made any
complaint prior to September 2004.

36

therefore meet the first element of their prima facie
burden.

With respect to the second element, an adverse
employment action is one "that a reasonable employee would
have found . . . materially adverse, which in [the
retaliation] context means it well might have dissuaded a
reasonable worker from making or supporting a charge of
discrimination." Burlington N. & Santa Fe Ry. Co. v.
White, 548 U.S. 53, 68, (2006) (citation omitted). But
"the significance of any given act of retaliation will
often depend upon the particular circumstances," and "petty
slights or minor annoyances" are not actionable. Id. at
68-69. This standard is broader than that which is applied
under the substantive antidiscrimination provision of Title
VII – "the anti-retaliation provision, unlike the
substantive provision, is not limited to discriminatory
actions that affect the terms and conditions of
employment." Id. at 64.

"Proof of causal connection" – the final element of a
prima facie retaliation case – "can be established
indirectly by showing that the protected activity was
followed closely by discriminatory treatment or through
other evidence such as disparate treatment of fellow
employees who engaged in similar conduct, or directly

37

through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (citations omitted). To establish a causal connection based on temporal proximity, a protected activity must be "closely followed in time by the adverse action." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996). See also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (stating, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'" and citing cases in which three- and four-month periods were found to be insufficient).

### a. Plaintiffs' Temporary Seat Relocation[20]

In January 2004, Mr. Horesnyi moved Plaintiffs' seats two aisles away from the core Inside Sales seating area; Plaintiffs' seats were returned to that area in October of the same year. (Defs.' R. 56.1 Stmt. ¶ 72.; Pls.' Mem. at 11, 54.) Plaintiffs contend that this "forced segregation"

---

[20] Although Plaintiffs Complaint and Amended Complaint characterize their seat relocation as discrimination, rather than retaliation, their submissions in opposition to summary judgment cite the relocation as retaliation for their Initial Complaints. Defendants highlight this variance to question whether Plaintiffs made the Initial Complaints. (Defs.' Reply at 30.)

was an act of retaliation for their Initial Complaints that impeded their sales performance, commission payouts, and ability to interact with other AEs. (Pls.' Mem. at 11, 54.) That the Initial Complaints preceded their relocation establishes the first element of their prima facie case on this claim.

Because Plaintiffs cannot satisfy the second element, however, this claim fails as a matter of law.  A change in desk or cubicle location does "not constitute a materially adverse change absent evidence of an unfavorable change in circumstances."  Gamble v. Chertoff, No. 04 Civ. 9410 (WHP), 2006 U.S. Dist. LEXIS 93645, at *15 (S.D.N.Y. Dec. 27, 2006); see also Fairbrother v. Morrison, 412 F.3d 39, 43 (2d Cir. 2005) (finding no materially adverse change where plaintiff was moved from forensics to a "floater" position between units and barred from entering her former unit).

Plaintiffs rely on Kessler v. Westchester County Department of Legal Services, 461 F.3d 199 (2d Cir. 2006), to contend that their relocation was "materially adverse." But unlike Plaintiffs' move to seats two aisles away, Kessler involved a transfer from one office to another, in another town.  While that transfer did not affect Kessler's job title, job grade, salary, benefits, or hours, unlike

Plaintiffs' relocation, it stripped him of responsibilities and forced him to do work normally performed by lower-level personnel. Id. at 203-204. On this basis, the Second Circuit found Kessler's transfer sufficiently adverse to support a retaliation claim, because these changes could dissuade a reasonable employee from complaining about discrimination. Id. at 210; see also White, 548 U.S. at 65 (holding that a jury could reasonably find reassignment to be materially adverse because resulting tasks were dirtier, more arduous, and less prestigious).

Fatally, Plaintiffs fail to establish that their relocation affected their responsibilities, tasks or pay. Both Plaintiffs were "upset" about their relocation; they assert that the move was "undesirable" and that, as a result of their relocation, they missed Inside Sales team meetings and thereby learned of new practices and procedures later than other AEs, and received fewer sales leads. (Pls.' Mem. at 54-56.) But exclusion from meetings does not render their relocation materially adverse. See Moore v. Consol. Edison Co. of N.Y., Inc., NO. 00 Civ. 7384 (PAC), 2007 U.S. Dist. LEXIS 19118, *18 (S.D.N.Y. Mar. 20, 2007) (holding that exclusion from meetings and opportunities for professional development were not adverse

employment actions).  Mere dissatisfaction does not equate
to material adversity.

Further, Plaintiffs have not shown that their
relocation impaired their performance or reduced their
sales opportunities or commissions.[21]  To the contrary, Mr.
Rasco's sales figures improved significantly in 2004, when
he was the Group's top performer.  (Defs.' R. 56.1 Stmt. ¶
73.)  And his performance deteriorated soon after his
return to the core Inside Sales seating area: for the first
quarter of 2005, his sales ranked last among AEs, and he
fell far short of his performance target.  (Rasco PIP I, at
1.)  This deterioration led Radianz to place him on PIPs in
June and August of 2005.  (Id.; Defs.' Resp. ¶ 88.)
Likewise, while Mr. Meikle's performance regressed in 2004,
it did not improve upon his return to his original aisle;
rather, that regression continued, culminating in his
receipt of a PIP in September 2005.  (Defs.' R. 56.1 Stmt.
¶¶ 74-75.)

Moreover, Inside Sales was part of an open floor plan
in which people were separated only by chest-high cubicles
-  from their relocated desks, Plaintiffs could speak to
the rest of the Group by raising their voices.  AEs often

---

[21] Plaintiffs assert that, during their relocation, Mr. Meikle "spoke
with his peers who had remained in the core Inside Sales seating area
and learned that they were receiving significantly more sales leads."
(Pls.' Mem. at 55.)  This statement is inadmissible hearsay.

41

communicated via IM, and Mr. Meikle did so even before his relocation. And Plaintiffs continued to participate in the lead ball rotation throughout their relocation. (Defs.' R. 56.1 Stmt. ¶¶ 76, 98.) These facts weaken Plaintiffs' description of the move as "forced segregation" and belie the material adversity of their relocation.

In sum, despite Plaintiffs' dissatisfaction with their move, it was not "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 65. Title VII does not protect employees from "petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 69. Because Plaintiffs cannot establish a prima facie case, their claim that their relocation was an act of retaliation fails as a matter of law.

### b. Hostile Workplace As an Act of Retaliation

In addition to their hostile workplace claim, Plaintiffs cursorily characterize Defendants' alleged creation of a hostile workplace as a retaliatory act.[22] To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade

---

[22] Neither party's submissions address this claim in the retaliation context; Plaintiffs merely allege "that defendants took myriad retaliatory actions, including . . . creating a hostile environment." (Pls.' Mem. at 53.)

a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his employment. Thomas, 438 F. Supp. 2d at 365.

By raising an issue of material fact as to their hostile workplace claim, Plaintiffs have established an adverse employment action and thereby satisfy the second element of their prima facie retaliation case. But they cannot causally connect, directly or indirectly, any of their complaints to the creation or continuation of that workplace hostility.[23] Indeed, Plaintiffs' Initial Complaints were protests against that very hostility: it is self-evident that the Initial Complaints could not have caused the hostility of which they complained. Nor do Plaintiffs contend that their complaints exacerbated that hostility. Because Plaintiffs have not demonstrated any causal connection between their protected activity and Defendants' alleged creation of a hostile workplace, they

---

[23] Further, Plaintiffs' failure to specify dates on which many of the incidents at issue occurred precludes the inference of any such causal connection.

43

cannot establish a prima facie retaliation claim. This
claim is dismissed.

### c. Other Claims of Retaliation

Plaintiffs allege that, following their September 2004
complaint of discrimination, Mr. Horesnyi ordered Mr. Rasco
to return ten of his accounts for reassignment to Caucasian
account executives. (Am. Compl. ¶ 63.) Plaintiffs cannot
make a prima facie case of retaliation on this allegation –
they neither give rise to an inference of discrimination
nor causally link it to Mr. Rasco's complaint.

Mr. Rasco was promoted to Team Leader in January 2004,
approximately four months after his counsel sent a letter
complaining of discrimination. Upon Mr. Rasco's promotion,
Mr. Horesnyi asked Mr. Rasco to relinquish a portion of his
smaller accounts for reassignment to the rest of the Group.
But Defendants present unrebutted evidence that, when Mr.
Tarantino and Ms. Attonito were promoted to Team Leader,
they were similarly asked to surrender a portion of their
accounts for distribution. Because Plaintiffs have not
presented evidence of disparate treatment or retaliatory
animus, this claim fails as a matter of law. See, e.g.,
Cook v. CBS, Inc., 47 F. App'x 594 (2d Cir. 2002) (granting
summary judgment on claim of retaliation where plaintiff

did not establish disparate treatment or provide evidence of retaliatory animus).

In addition, Plaintiffs reframe many of their disparate treatment claims as retaliation claims, alleging that, in retaliation for their complaints, Mr. Horesnyi discriminatorily distributed sales opportunities and issued Mr. Rasco instructions relating to his dealings with clients. Because those allegations remain unsupported, and for the same reasons that they cannot survive as discrimination claims, they are dismissed.

### d. Mr. Meikle's Delayed Paychecks

Plaintiffs allege that, in retaliation for Mr. Meikle's complaints of discrimination, Radianz withheld "numerous" of his paychecks. (Am. Compl. ¶59.[24]) Mr. Meikle testified that this claim pertained to one or two paychecks, which were merely delayed, rather than withheld. Meikle Dep. at 282. Plaintiffs have not established a prima facie case on this claim, and it fails as a matter of law.

"Courts in this Circuit have held that a delay in transmitting a paycheck is not a materially adverse action under Title VII." Blake v. Potter, No. 03 Civ. 7733 (LAP),

---

[24] Plaintiffs' submissions in opposition to summary judgment do not address this claim.

45

2007 U.S. Dist. LEXIS 72703 (S.D.N.Y. Sept. 24,

2007)(collecting cases).  Further, "[a]ssuming arguendo

that the delayed payments constituted adverse employment

actions, the plaintiff has not directed the Court to facts

that support any inference of discrimination or retaliation

behind the delays."  Miller v. N.Y. City Health & Hosp.

Corp., No. 00 Civ. 140 (PKC), 2005 U.S. Dist. LEXIS 17975,

at *17-18 (S.D.N.Y. Aug. 22, 2005).

### e. Defendants' Refusal to Spread Plaintiffs' "Clawbacks"

Plaintiffs also allege that, in retaliation for their

complaints and in violation of company policy, Defendants

refused to spread their "clawbacks."  (Pls.' R. 56.1 Stmt.

¶¶ 169-170.)  When a Radianz client cancelled its service,

the AE who had sold that service had to return his

previously-earned sales commission to Radianz – this

repayment was called a "clawback."  Without evidentiary

support, Plaintiffs assert that to alleviate the financial

impact thereof, and as a matter of company policy,

Defendants routinely spread an AE's clawbacks across

several paychecks.

"Such isolated evidence" as Plaintiffs' assertion "is

insufficient to make a showing that [Defendants] maintained

a policy or custom."  Graham, 230 F.3d at 41.  To the

contrary, the evidence indicates that the dilution of clawbacks was a courtesy that rewarded superior performance. (Defs.' Resp. ¶ 170.) The only clawback to which Plaintiffs specifically refer involves a September 2005 email exchange in which Vince Derogatis, a Caucasian Radianz executive, denied Mr. Horesnyi permission to spread Mr. Meikle's clawback. Mr. Derogatis denied Mr. Horesnyi's request because "we only do things around here to accommodate producers. Don't believe Garrick's #'s qualify him as a producer." (Reply Affidavit of Mitchell Boyarsky in Support of Defendants' Motion for Summary Judgment, Ex. S.) This articulates a legitimate and non-retaliatory reason for Mr. Derogatis' refusal to spread Mr. Meikle's clawback. Because Plaintiffs have not presented evidence in support of any inference of discrimination or retaliation, their clawback-related claim fails.

### f. Plaintiffs' "Mafia"-Related Claims

Plaintiffs allege that, after they complained of discrimination, individuals at Radianz retaliated by boasting of their ties to the Mafia. (Am. Compl. ¶¶ 57-58.[25]) Even assuming the truth of these assertions, they do not support a retaliation claim.

---

[25] Plaintiffs' brief in opposition to summary judgment repeats these allegations as background, but it does not address or discuss them.

47

While threats can amount to materially adverse actions, Plaintiffs have not shown that any Mafia-related remarks were directed at Plaintiffs, that the remarks had clear implications, or that the "threats" were ever carried out.  See, e.g., Thomas v. iStar Fin. Inc., 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006) (threats were not adverse actions because they were not directed at plaintiff and "did not necessarily have a clear implication"); Pugni v. Reader's Digest Ass'n, No. 05 Civ. 8026 (CM), 2007 U.S. Dist. LEXIS 26284, at *67 (S.D.N.Y. Apr. 5, 2007) (alleged "threat" did not constitute a materially adverse action because it was never carried out).  Nor have Plaintiffs causally connected these remarks to their complaints of discrimination. Consequently, this retaliation claim fails as a matter of law.

### g. Mr. Rasco's Receipt of Two PIPs and Alleged Demotion

Plaintiffs allege that Mr. Rasco's June 2005 PIP effectively constituted a demotion, and that Mr. Rasco was placed on that PIP and his August 2005 PIP because he complained of discrimination.  (Am. Compl. ¶¶ 64, 81.)  The Court grants summary judgment on this claim because, even assuming that Plaintiffs can make a prima facie case thereon, they have  not adduced evidence that the non-

discriminatory reasons for which Defendants issued these PIPs were pretexts for retaliation.

The record reflects that Mr. Rasco received these PIPs because of problems relating to his performance, behavior, and attendance.  The June 2005 PIP details Mr. Rasco's poor sales performance, his failure to attend any events during a sales retreat, his inability to arrive at work on time, his insubordinate, discourteous and insulting behavior towards Mr. Horesnyi, and his continued failure to update his computer software.  (Defs.' R. 56.1 Stmt. ¶ 159.)  The August 2005 PIP underscores Mr. Rasco's twelve absences during July and August of that year and his resulting failures to contact clients.  (Defs.' R. 56.1 Stmt. ¶ 161.) Plaintiffs' submissions in opposition to summary judgment do not address these points, let alone cite to any evidence disputing the facts that Mr. Rasco's PIPs catalog.  This claim is dismissed.

### h. Retaliatory Constructive Discharge

As set forth below, Plaintiffs have not established Mr. Rasco's constructive discharge.  In view of that failure, Mr. Rasco's resignation does not support a retaliation claim.

### i. Radianz's Lawsuit against Mr. Rasco[26]

Plaintiffs summarily characterize Radianz's lawsuit against Mr. Rasco as a retaliatory act.[27] Radianz initiated this suit, however, after Mr. Rasco had resigned and terminated his employment. It follows that, because Mr. Rasco was no longer a Radianz employee, the lawsuit cannot be construed as an employment action, much less an adverse employment action. This claim fails as a matter of law.

### D. Constructive Discharge

Plaintiffs attribute Mr. Rasco's resignation from Radianz on August 8, 2005 to Defendants' "discrimination, hostile work environment, and misconduct" against him, and assert a claim of constructive discharge on that basis. (Am. Compl. ¶ 83; Pls.' Mem. at 61.) Because this claim does not raise a genuine issue of material fact, it is dismissed.

Constructive discharge occurs when an "employer, rather than discharging [an employee] directly, intentionally creates a work environment so intolerable

---

[26]Again, Defendants urge the Court to disregard Plaintiffs' arguments relating to this lawsuit, because it was not mentioned in Plaintiffs' First or Amended Complaint.

[27] Neither party's submissions address this claim in the retaliatory context; Plaintiffs merely allege "that defendants took myriad retaliatory actions, including . . . filing a retaliatory lawsuit . . . ." (Pls.' Mem. at 53.)

that [the employee] is forced to quit involuntarily."
Petrosino, 385 F.3d at 229 (citation and quotations
omitted). To succeed on a claim for constructive
discharge, a plaintiff must first establish the existence
of a hostile work environment by showing "harassing
behavior sufficiently severe or pervasive to alter the
conditions of [her] employment." Pa. State Police v.
Suders, 542 U.S. 129, 133-134 (2004) (citation omitted). A
plaintiff must then show "that the abusive working
environment became so intolerable that her resignation
qualified as a fitting response." Id. In so doing, the
plaintiff must "demonstrate that the employer's actions
were deliberate and not merely negligent or ineffective,"
and that these actions created "the sort of circumstance
that would cause a reasonable person to conclude that
quitting was the only way she could extricate herself from
intolerable conditions." Petrosino, 385 F.3d at 230-31.

Plaintiffs argue that Defendants' discrimination and
retaliation against Mr. Rasco, and the hostility of his
workplace, compelled his resignation.[28] While Plaintiffs
have raised factual issues as to the existence of a hostile

---

[28] In further support of their claim of constructive discharge,
Plaintiffs cite Mr. Rasco's removal from the building upon his
resignation and Radianz's subsequent lawsuit against Mr. Rasco.
Because these acts occurred after Mr. Rasco's resignation, however, it
is axiomatic that they could not have contributed to his decision to
resign.

51

workplace, they have not shown that Defendants intentionally created these conditions or intended that Mr. Rasco resign.[29]  Moreover, Plaintiffs have not offered evidence from which a jury could infer that a "reasonable person in [Mr. Rasco's] position would have felt compelled to resign," Suders, 542 U.S. at 137.  The Court grants summary judgment on Mr. Rasco's claim of constructive discharge.

### IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is DENIED as to Plaintiffs' hostile work environment claims and GRANTED as to Plaintiffs' remaining claims.


SO ORDERED:

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           March 17, 2009

---

[29] Plaintiffs argue that Radianz executives' 2003 comments that they would not be "extorted" by complaints of discrimination demonstrate that intent, but those comments were made two years before Mr. Rasco's resignation, and they were not directed at Mr. Rasco.